UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| BRYAN COLBY CHAPPELL, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:20-cv-00686-MPB-MG ) |
| KIMBERLY RHOADS Dental Assistant - Ms., JENNIFER VAN WAGONER Dr., | ) ) ) |
| Defendants. | ) ) |

**Report and Recommendation Regarding Defendants' Affirmative Defense that Plaintiff Failed to Exhaust Available Administrative Remedies**

This matter has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the question of whether plaintiff Bryan Chappell exhausted his administrative remedies before filing this lawsuit, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). The Court held a hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), on December 6, 2022.[1] Dkt. 135. For the reasons set forth below, the Magistrate Judge recommends that the Court **FIND** that Mr. Chappell did not exhaust his available administrative remedies before filing suit, that the action be **DISMISSED**, and that the Court adopt the following findings of fact and conclusions of law.

**I. Background**

Bryan Chappell, a federal inmate formerly incarcerated at the Federal Correctional Institution in Terre Haute, Indiana ("FCI Terre Haute"), brings this civil action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Mr. Chappell alleges

---

[1] The Court is grateful for the significant time and efforts of volunteer counsel Dean Brackenridge and Katherine Slisz of Frost Brown Todd, LLP, in representing Mr. Chappell.

1

that the defendants, dental hygienist Kimberly Rhoads and dentist Dr. Jennifer Van Wagoner, violated his Eighth Amendment rights by not providing constitutionally adequate medical treatment for a broken tooth between December 2019 and April 2020. The defendants raised the affirmative defense that Mr. Chappell failed to exhaust his available administrative remedies before filing this lawsuit as required by the PLRA. Dkt. 39. Because there were factual disputes precluding the resolution of the exhaustion defense on a summary judgment motion, the defendants withdrew their motion for summary judgment and requested a *Pavey* hearing. Dkts. 93, 94.

## II. Legal Standard

The PLRA requires that a prisoner exhaust his available administrative remedies before bringing a suit concerning prison conditions. 42 U.S.C. §1997e(a); *Porter v. Nussle,* 534 U.S. 516, 524−25 (2002). The statutory exhaustion requirement is that "[n]o action shall be brought with respect to prison conditions…by a prisoner…until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

"To exhaust available remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020); *see also Dale v. Lappin,* 376 F.3d 652, 655 (7th Cir. 2004) ("In order to properly exhaust, a prisoner must submit inmate complaints and appeals in the place, and at the time, the prison's administrative rules require.") (internal quotation omitted). "In order to exhaust administrative remedies, a prisoner must take all steps prescribed by the prison's grievance system." *Ford v. Johnson,* 362 F.3d 395, 397 (7th Cir. 2004).

It is the defendants' burden to establish that the administrative process was available to Mr. Chappell and that he failed to use it. *Reid,* 962 F.3d at 329; *see also Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it."). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake,* 578 U.S. 632, 642 (2016) (internal quotation omitted). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal quotation omitted). An administrative procedure is unavailable when 1) the process operates as a "simple dead end," 2) when it is so opaque that it is incapable of use, or 3) when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

An administrative process is unavailable if prison staff refuse to provide the necessary forms. *Gooch v. Young*, 24 F.4th 624, 627−28 (7th Cir. 2022). Additionally, "[w]hen an inmate claims that the grievance process is unavailable because he fears reprisal, he must demonstrate that a person of 'ordinary firmness' would have been deterred from filing a grievance in the circumstances alleged. This is an objective standard." *Ebmeyer v. Brock*, 11 F.4th 537, 543 (7th Cir. 2021) (cleaned up) (citing *Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013) and *Kaba v. Stepp*, 458 F.3d 678, 684−85 (7th Cir. 2006)).

### III. Findings of Fact

The following facts are found by the Court to be true based on the stipulated facts, dkt. 132, and the evidence and testimony presented during the hearing.

### A. The Administrative Remedy Process

The administrative remedy program of the Bureau of Prisons ("BOP") typically consists of four steps, summarized as follows: (1) an inmate must file a BP-8 with the institution and try to informally resolve the issue; (2) if the issue is not informally resolved, the inmate must file a BP-9 for response by the Warden; (3) if the inmate is not satisfied with the Warden's response, the inmate then mails a BP-10 to the Regional Office; and (4) if the inmate is not satisfied with the Regional Director's response, he next mails a BP-11 to the Central Office. Dkt. 132 at ¶ 5. An administrative remedy is considered exhausted after it has gone through all four steps. *Id.*

Inmates at FCI Terre Haute could obtain the grievance forms several ways, including by walking into their counselor's office or, if their unit was on lockdown status, by requesting a form from a counselor, case manager, or unit manager. Dkt. 136 at 14:5−17. Unit team members collected BP-8s and BP-9s, while inmates were responsible for sending BP-10s and BP-11s in the mail. *Id.* at 15:5−23. To do this, the inmates would place the mail in a secured mailbox, and correctional officers collected the mail. *Id.* at 16:2−23. If a unit was on lockdown—including during the COVID-19 pandemic—correctional officers would collect the mail by walking around with a mail tote or taking mail directly from an inmate from his cell door. *Id.* at 17:18−24.

Robert Rosso, a formerly incarcerated person who was housed with Mr. Chappell at FCI Terre Haute during the relevant timeframe, testified that correctional officers and other prison staff often failed to hand out grievance forms during the COVID-19 pandemic, because "COVID was very difficult for staff and inmates alike. It was total disarray." Ex. 46 at 43:13−23. Thus, he often provided copies of the forms to inmates because he "did a lot of law work" and "had files of [the forms.]" *Id.* at 43:17−21.

4

Between March 21, 2019, and January 6, 2021, the following number of remedies were submitted by inmates in Unit 3 (where Mr. Chappell was housed):

- To the institution level: 209;
- To the Regional Office: 176;
- To the Central Office: 68.

Dkt. 132 at 7, ¶ 19. Homing in closer to the timeframe at issue here, from December 2019 through May 2020, the following number of remedies were submitted by inmates in Unit 3:

- To the institution level: 68 (Ex. 29 at TH0852−59);
- To the Regional Office: 50 (Ex. 31 at TH0820-90);
- To the Central Office: 22 (Ex. 33 at TH0903−07).

**B. Mr. Chappell's Grievance History**

Mr. Chappell is a BOP inmate who was housed at FCI Terre Haute from November 6, 2015, to January 6, 2021. Dkt. 132 at ¶ 6. During Mr. Chappell's confinement at FCI Terre Haute, he submitted about 75 BP-9s, BP-10s, and BP-11s. Dkt. 132 at ¶ 9; dkt. 132-5. Mr. Chappell successfully exhausted at least five remedy cases, but none were related to his allegations against Ms. Kimberly Rhoads and Dr. Jennifer Van Wagoner. Dkt. 132 at ¶ 10.

Mr. Chappell's testimony evidenced a familiarity with the intricacies of the administrative process. Dkt. 136 at 158:8−25−159:1−19.

While the defendants contend that Mr. Chappell did not exhaust his administrative remedies as to his claims in this case, Mr. Chappell asserts that the administrative remedy process was not available to him because of threats by BOP staff and lack of access to necessary forms.

5

**C. Evidence Related to Availability of the Grievance Process**

    i.    **The BP-8**

Mr. Chappell filed a BP-8 on March 20, 2020, in which he complained about the delay in seeing the dentist after he submitted a healthcare request form around Christmas for his broken tooth. Ex. 13 at TH0228. Dr. Van Wagoner e-mailed Ms. Rhodes on March 23, asking her to look into the issue. *Id.*, dkt. 137 at 47.

On March 24, Ms. Rhodes went to Mr. Chappell's housing unit to discuss the BP-8 with him. Dkt. 137 at 48:13−23. There was conflicting testimony at the hearing about the nature of the visit, so the Court provides a summary of both versions.

Ms. Rhodes' goal for the encounter was to resolve the grievance by recommending that Mr. Chappell sign up for sick call, so before she went to his cell she pre-filled the section on the form stating "Issue Resolved Comments" by writing "Sign up for sick call." *Id.* at 50:3−6, 53:2−4. Ms. Rhodes recalled that she told Mr. Chappell that he had to submit another healthcare request form because he had not shown up to his previous appointment. *Id.* at 48:18−25. Mr. Chappell explained that he didn't go to the appointment because he was in the hospital. *Id.* Ms. Rhodes said she told him it was "not a big deal" but he would have to sign back up to be seen. *Id.* at 50:1−4.

Ms. Rhodes testified that Mr. Chappell responded to the proposal by becoming angry, raising his voice, balling his hands into fists, and shaking. *Id.* at 50:13−18. She testified that "his level of anger didn't match what [she] was there to discuss with him." *Id.* at 51:19−22. His response made her fearful, because his cell was located on the second tier of his housing unit and her back was against the railing, so he could have easily pushed her over the railing. *Id.* at 50:23−25−51:1−3; 99:11−12. Ms. Rhodes had a body alarm, but she didn't press it because she

felt like she could still get away from him and wanted to avoid an emergency situation where he would be placed on the ground in restraints. *Id.* at 51:3−13.

Because Mr. Chappell did not agree to the proposal, Ms. Rhodes crossed out her writing in the "Issue Resolved Comments" section, and instead, in the "Unable to Address Issue Comments" section, she wrote, "Pt. refuses to sign[.] Told to go to sick call." *Id.* at 53:1−9; Ex. 18 at TH0051. Ms. Rhodes denied that she threatened Mr. Chappell that he would not receive treatment or that she screamed or swore at him. Dkt. 136 at 54:2−15.

Mr. Chappell testified that Ms. Rhodes was the angry one during this encounter. He testified that she came to his cell and screamed, "You don't fucking write me up. . . . You are going to sign off on this." *Id.* at 161:23−25−162:1. According to Mr. Chappell, he refused to sign the BP-8 because doing so would indicate the issue was resolved, but he still needed treatment. *Id.* at 162:7−11. He denied that he balled up his fists or acted in any other threatening way. *Id.* at 165:23−25−166:1−6. Mr. Rosso, who was housed near Mr. Chappell at the time, testified that he, too, saw Ms. Rhodes wave the forms at Mr. Chappell and that she told him that "if he wanted his teeth fixed, he would sign off [on the BP-8]." Ex. 46 at 30:21−25. Mr. Rosso testified that he heard Ms. Rhodes swear at him, "using the F word a lot," but noted "that's how she talks, though." *Id.* at 31:10−13. He testified that Mr. Chappell did not scream back but acted "startled." *Id.* at 32:15−16. Mr. Rosso testified that when Ms. Rhodes left, Mr. Chappell said something like, "Can you believe . . . what that bitch just did? Can you believe she's crazy." *Id.* at 33:19−21.

After the encounter, Ms. Rhodes immediately went back to the dental clinic and told Dr. Van Wagoner about the encounter. Dkt. 136 at 55:8−16. Dr. Van Wagoner recalled that Ms. Rhodes was "upset and afraid" at this time. *Id.* at 98:17−21. Recognizing that Mr. Chappell's disproportionate reaction might be caused by his mental health issues, Ms. Rhodes then emailed

7

Dr. Jacqueline Carmicheal, Mr. Chappell's treating psychologist, for advice on how to resolve the situation.[2] *Id.* at 55:19−25−56:1−4, Ex. 215. Ms. Rhodes' objective at that point was to have Mr. Chappell sign the BP-8 and have him resubmit a healthcare request form so that he could get his treatment sooner. *Id.* at 58:16−25−59:1.

Ms. Rhodes, Dr. Van Wagoner, and Dr. Carmicheal met with Mr. Chappell later that day to discuss the BP-8. *Id.* at 59:19−25−60:1−5. Dr. Van Wagoner recalled that Ms. Rhodes requested her presence at the meeting because she did not want to be alone with Mr. Chappell again after their encounter at his cell. *Id.* at 100:9−12. At the meeting, Dr. Carmicheal explained the situation, but Mr. Chappell again refused to sign the BP-8. *Id.* at 60:7−11. Ms. Rhodes and Dr. Van Wagoner testified that they did not threaten Mr. Chappell during this meeting or "stare at him hatefully." *Id.* at 60:11−14, 100:19−23. Dr. Carmicheal said that "both [Dr. Van Wagoner and Ms. Rhodes] were extremely professional and patient in their interactions with him when [she] was present." Ex. 225 at TH0236. Mr. Chappell recalled that the dental staff was attempting to coerce him to sign the BP-8 during the meeting. Dkt. 136 at 166:19−22.

Mr. Chappell signed up for dental sick call on March 26 and was seen that day by Dr. Van Wagoner. Ex. 16. She filled a crack in his tooth with a glass isomer cement and told him to return if his symptoms returned. *Id.*

---

[2] Mr. Chappell has been diagnosed with Major Depressive Disorder with Psychotic Features, Posttraumatic Stress Disorder, and Psychotic Disorder Due to Another Medical Condition with Delusions. Ex. 222. Dr. Carmicheal testified that Mr. Chappell suffered from delusions in which he believed that medical and custodial staff were mistreating him in an effort to cover up a negative medical procedure that occurred at a hospital in Terre Haute in September 2017. Ex. 48 at 9:19−23, 13:4−10. Dr. Carmicheal testified that his delusions extended to Ms. Rhodes and Dr. Van Wagoner and that "it can be fairly typical for paranoia and delusional beliefs to extend to or encompass more and more people over time, and that's what [she] observed with Mr. Chappell." *Id.* at 13:11−19.

The Court finds credible Ms. Rhodes and Dr. Van Wagoner's testimony that they never threatened Mr. Chappell or attempted to dissuade him from exhausting his administrative remedies during their encounters with him on March 24. Indeed, recognizing that Mr. Chappell was perhaps suffering from symptoms related to his diagnosed mental illness, Ms. Rhodes reached out to his mental health provider to facilitate a conversation about Mr. Chappell's options.

The Court does not find credible Mr. Chappell's testimony that dental staff were attempting to coerce him into signing the BP-8. While the conversation outside at Mr. Chappell's cell may have been tense, there is no credible testimony that Ms. Rhodes or Dr. Van Wagoner said anything that would have deterred an inmate of ordinary firmness from continuing with the exhaustion process. Indeed, Mr. Chappell was not deterred, as he did not sign the BP-8 and instead continued with the exhaustion process by filing a BP-9.

### ii. The BP-9

Mr. Chappell submitted a BP-9 on March 27, 2020, in which he again complained about the delay in his dental treatment. Ex. 19 at TH0268. In the BP-9, he recounts the March 24 encounter with Ms. Rhodes, Dr. Van Wagoner, and Dr. Carmicheal, stating that Ms. Rhodes was "irate" and that both dental staff insisted that he had to start the healthcare request process over, which would cause further delay in his treatment. *Id.* He also complains about the quality of care he received on March 26, saying that putting the dental cement over the broken tooth was going to cause an infection and was an act of retaliation done to cause him additional pain. *Id.* at TH0272. Dr. Van Wagoner was "shocked and surprised" upon seeing Mr. Chappell's BP-9 because that was not how she "witnessed the interaction and the appointment at all." Dkt. 136 at 106:11−13.

On April 28, 2020, Ms. Rhodes and Dr. Jerrica Patterson, Mr. Chappell's treating psychologist as of April 2020, discussed the BP-9 with Mr. Chappell.[3] *Id.* at 137:16−21, 144:1; Ex. 222. Dr. Patterson observed that Mr. Chappell was "calm and appropriate" during the conversation. Ex. 222. Dr. Patterson recalled that Ms. Rhodes explained the treatment that had been provided and that what he perceived as evidence of a rotting tooth was just discoloration from the filling. Dkt. 136 at 144:3−11. Dr. Patterson said that Ms. Rhodes asked him if her response was sufficient to resolve the issue, and that when Mr. Chappell said no, she "remind[ed] him that he could continue with the process." *Id.* at 145:13−18. Dr. Patterson testified that Ms. Rhodes did not threaten Mr. Chappell or pressure him into dropping his administrative remedy. *Id.* at 145:19−23.

Again, Mr. Chappell remembers this encounter differently. He testified that Ms. Rhodes "was ordering [him] to sign off on it" and saying that no one would help him. *Id.* at 174:10−15. Inmate Rosso testified that he also observed this interaction, that Ms. Rhodes was "very aggressive" and that she was telling him to sign off on the administrative remedy, but Mr. Chappell refused. Ex. 46 at 35:14−20.

Lt. Sherman conducted an investigation into Mr. Chappell's allegations of dental staff's misconduct outlined in the BP-9. *Id.* at 124:1−12. Lt. Sherman spoke with Ms. Rhodes, Dr. Van Wagoner, and Dr. Carmicheal, who recounted their interactions with Mr. Chappell. Ex. 224. Dr. Carmicheal explained to Lt. Sherman via email that Mr. Chappell suffers from "fixed paranoid and delusional beliefs regarding medical staff" and has a "tendency to misperceive all interactions with staff as negative and threatening." Ex. 225 at TH0236.  Lt. Sherman, per his captain's

---

[3] Ms. Rhodes did not recall discussing the BP-9 with Mr. Chappell but testified that the purpose of any meeting would have been to get Mr. Chappell to understand his treatment and explain his options. Dkt. 136 at 66:9−23.

instructions, did not write a conclusion on the report, but he submitted it via email to the warden. Dkt. 136 at 126:10−18. The warden marked "No further review required" and signed the report. Ex. 224 at TH0071. Lt. Sherman explained that this meant that "the warden did not find any staff misconduct and that there would be no further review required." Dkt. 136 at 127:2−3.

The Court finds Dr. Patterson credible with respect to her memory of the April 28 meeting with Mr. Chappell and Ms. Rhodes. That is, the Court finds that no one threatened Mr. Chappell or discouraged him from pursuing his administrative remedies.

### iii. The BP-10 and BP-11

Mr. Chappell testified that he obtained a BP-10 form from another inmate because staff would not provide him the form. *Id.* at 177:13−16. He testified that he handed the BP-10 to a guard in an envelope because he could not leave his cell. *Id.* at 177:22−25. He did not get a return receipt indicating that the BP-10 had been received, and he never received a response related to the BP-10. *Id.* at 178:2−7.

Mr. Chappell testified that he also received a BP-11 form from another inmate and that he completed and mailed it. *Id.* at 178:8−22. He could not remember if he handed it to a guard or took it to the mailroom, because he had suffered from a stroke which affected his memory. *Id.* at 178:23−25. He never received a return receipt related to the BP-11 or any notification that it had been received by the appropriate office. *Id.* at 179:3−12.

Mr. Chappell believes the forms were either lost or intentionally thrown away, but he admitted that he did not see anyone throw his forms away and that no one told him that they had thrown them away or seen anyone else do so. *Id.* at 216:1−11. Nor could he identify who he thinks threw the forms away. *Id.* at 216:15−218:8. Mr. Chappell does not have copies of these forms because he lacked access to a copier when he was locked down. *Id.* at 184:23−185:1.

The Court does not find credible Mr. Chappell's testimony that he mailed both a BP-10 and BP-11 form about his dental care to the appropriate office. The evidence shows that inmates in Unit 3 had the means to send BP-10 and BP-11 forms. Exs. 31, 33. Between December 2019 and May 2020, 50 BP-10 forms and 22 BP-11 forms were mailed to the appropriate office from inmates in Mr. Chappell's housing unit. Ex. 31 at TH 0820−90; ex. 33 at TH0903−07. Mr. Chappell himself submitted a BP-10 to the North Central Region on an unrelated matter on February 28, 2020, which was responded to on March 16, 2020. *Id.* at 18−26. Thus, the Court finds that the forms and the means to mail the forms were available to Mr. Chappell at all relevant times.

### IV. Conclusions of Law

Mr. Chappell concedes that he did not complete the BOP's grievance process, so the question before the Court is whether that process was available to him. It is the defendants' burden to establish that the grievance process was available. *Reid*, 962 F.3d at 329. The Court finds that the defendants met that burden here.

First, the Court finds that neither the defendants nor other BOP staff engaged in affirmative misconduct to prevent Mr. Chappell from exhausting his remedies. *See Ebmeyer*, 11 F.4th at 543 ("When an inmate claims that the grievance process is unavailable because he fears reprisal, he must demonstrate that a person of ordinary firmness would have been deterred from filing a grievance in the circumstances alleged."); and *Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015) ("The fact that [the plaintiff] was able to exhaust two of his claims offers a reason to reject his claim that he was prevented from exhausting his other six."). The parties have spent a great deal of time and energy to present evidence about the nature of the encounter that occurred between Ms. Rhodes and Mr. Chappell at his cell on March 24. The Court finds credible the testimony of Ms. Rhodes, Dr. Van Wagoner, and Dr. Carmicheal that they were professional in their meetings

with Mr. Chappell and that their goal was to resolve the administrative remedy by getting Mr. Chappell the dental care he needed. No inmate of ordinary firmness would have been deterred from filing a grievance after a sit-down meeting with his psychologist and the dental staff was held to explain the process. And regardless, Mr. Chappell was not intimidated by what staff told him because he refused to sign the BP-8 and instead proceeded to the BP-9.

Thus, the only question is whether staff misconduct prevented Mr. Chappell from submitting a BP-10 or BP-11. Mr. Chappell argues in his post-hearing brief that he did not have access to the necessary forms, dkt. 138 at 8−9, but Mr. Chappell's testimony was that he mailed the correct forms but never received a response, dkt. 136 at 178−79. The Court concludes that the forms were available at all times to Mr. Chappell. And there is no credible evidence that anyone destroyed the forms or tampered with Mr. Chappell's mail to prevent him from exhausting this particular remedy.

Accordingly, the Court concludes that the administrative remedy process was available to Mr. Chappell at all relevant times, and he failed to utilize it. *Wallace v. Baldwin*, 55 F.4th 535, 545 (7th Cir. 2022) (explaining before summary judgment can be entered for failure to exhaust, a district court must find that an inmate's administrative remedies were available).

### V. Conclusion

Based on the Court's factual finding, the Magistrate Judge finds that the defendants have met their burden of showing that the administrative remedy process was available to Mr. Chappell and he did not avail himself of it. Based on this finding, the Magistrate Judge recommends that the Court find that Mr. Chappell did not exhaust his available administrative remedies and dismiss his claims without prejudice.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). The failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

**IT IS SO ORDERED.**

Date: 7/24/2023

Mario Garcia
United States Magistrate Judge
Southern District of Indiana

Distribution:

BRYAN COLBY CHAPPELL
25865-009
MARIANNA - FCI
MARIANNA FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 7007
MARIANNA, FL 32447

All Electronically Registered Counsel